**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROGER NICHOLAS STRICKLAND<br><br>Plaintiff,<br><br>v.<br><br>THE CHEMOURS COMPANY<br><br>Defendant. | ) | Case No. _______________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

**1.** This is an action for damages and other relief resulting from Defendant's retaliation against Plaintiff in violation of the Consumer Product Safety Improvement Act of 2008 ("CPSIA"), 15 U.S.C. § 2087, and the Delaware Whistleblowers' Protection Act ("DWPA"), Del. Code Ann. tit. 19 § 1701 *et seq.*

**2.** In early 2024, Plaintiff Strickland learned that an environmental regulatory agency in Europe was going to reclassify a byproduct of a chemical used in a number of Defendant's leading refrigerant products as a reproductive toxin. After Plaintiff Strickland reported this finding within Defendant Chemours (the "Company"), engaged in efforts to investigate what the Company had previously known about the toxicity of the refrigerant, and asked questions about the Company's response to the information – and despite the fact that Defendant had recently praised his performance – Defendant retaliated against Plaintiff Strickland by abruptly terminating his employment.

**3.** Plaintiff brings this action to recover damages for losses sustained as a result of that unlawful conduct.

## PARTIES

**4.** Plaintiff Roger Nicholas Strickland ("Plaintiff" or "Mr. Strickland") is a resident of the State of Delaware. At all times relevant to this dispute, Mr. Strickland was an employee of Defendant.

**5.** Defendant The Chemours Company ("Defendant" or "Chemours" or "the Company") is a corporation organized under the laws of Delaware. Its headquarters and principal place of business is 1007 Market Street, Wilmington, Delaware, 19898. Shares of its stock trade on the New York Stock Exchange.

## JURISDICTION AND VENUE

**6.** This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1331 because Plaintiff's claim under the Consumer Product Safety Improvement Act of 2008 ("CPSIA"), 15 U.S.C. § 2087, arises under the laws of the United States.

**7.** Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's claim for violation of the Delaware Whistleblowers' Protection Act ("DWPA"), Del. Code Ann. tit. 19 § 1701 *et seq.*, because this claim is so related to Plaintiff's federal claim as to form part of the same case or controversy under Article III of the United States Constitution.

**8.** Venue is proper in this federal district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**9.** This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Delaware.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

**10.** Under the CPSIA, a person who believes he or she has been retaliated against in violation of the Act, must first file a complaint with the United States Department of Labor ("DOL") within 180 days of the violation.

**11.** If the DOL has not issued a final decision on the complaint within 210 days of the filing of the complaint, or within 90 days after receiving a written determination, the complainant may bring a *de novo* action at law or equity against the respondent in the appropriate district court of the United States.

**12.** On March 13, 2024, Mr. Strickland filed a complaint of retaliation with OSHA, which asserted that he had been retaliated against in violation of the CPSIA and the Clean Air Act. The filing was timely as the date of the filing was within 180 days of the date of his termination.

**13.** On August 5, 2026, OSHA issued findings in which it stated that it was unable to conclude if there was reasonable cause to believe a violation of the relevant statutes occurred. On August 31, 2026, Mr. Strickland filed objections to the findings and requested a hearing on his claims under the CPSIA and the Clean Air Act before an Administrative Law Judge.

**14.** More than 210 days have elapsed since Mr. Strickland filed his complaint, and the DOL has not issued a final decision regarding Mr. Strickland's complaint. Additionally, Mr. Strickland files the present complaint within 90 days after receiving the August 5, 2026 findings from OSHA.

**15.** Accordingly, under the CPSIA, Mr. Strickland has exhausted his administrative remedies and may bring his CPSIA claim in this court.

## FACTUAL ALLEGATIONS

**Mr. Strickland's Background and Employment With Chemours**

**16.** Roger Nicholas ("Nick") Strickland is a highly-experienced marketing and sales executive with more than twenty years of experience in the chemical industry, with particular expertise in the marketing and sale of refrigerants. Mr. Strickland holds a Bachelor of Science in Chemical Engineering from the Georgia Institute of Technology (Georgia Tech). As of early 2023, he was working for the University of Delaware as a Technology Business Advisor for the Delaware Small Business Development Center (SBDC), where he helped entrepreneurs commercialize emerging technologies.

**17.** Earlier in his career, Mr. Strickland had worked for more than a decade at E.I. duPont Nemours & Company ("DuPont"), one of the world's largest chemical companies. Mr. Strickland had a successful tenure with DuPont, serving in a number of roles and eventually advancing to the position of Business and Market Manager, before he left in 2012. Defendant Chemours was formed as a result of a corporate spinoff, in 2015, from DuPont. Over the years, a number of colleagues encouraged Mr. Strickland to think about joining Chemours.

**18.** In May 2023, a former colleague, Christina Spalding reached out to Mr. Strickland and encouraged him to apply for an open role. Ms. Spalding was the Head of Refrigerant Sales within Thermal Specialized Solutions ("TSS"), one of the Company's three divisions. The role was for Americas Regional Marketing Manager for refrigerants. Refrigerants were the largest and most profitable segment of TSS.

**19.** The Company's leading refrigerant is R-1234yf, which is marketed by Chemours as "Opteon." (As will be discussed further *infra*, R-1234yf was developed jointly with Honeywell, which markets its product under the brand name "Solstice.") The initial

market for R-1234yf was automotive air-conditioning, and the product was (and is) sold widely in the market for professional auto technicians and in retail auto supply stores directly to do-it-yourself consumers for use in their own vehicles and storage in their own homes. The refrigerant is currently used in approximately two hundred and fifty million light-duty vehicles.

**20.** R-1234yf was also systematically incorporated into "stationary" cooling systems, such as those for supermarkets, buildings, industrial processes, and data centers. R-1234yf is also used in home heating, ventilation, and air conditioning ("HVAC") systems. It is a principal active component of R-454B, one of the primary refrigerants Chemours has marketed for use in residential central air conditioners and heat pumps.[1] Chemours actively marketed (and markets) R-454B, under the brand name "Opteon XL41," to the residential HVAC industry, and several of the largest original equipment manufacturers ("OEMs") of home heating and cooling equipment in the United States used (and use) R-454B for their residential product lines.

**21.** The open role that Mr. Strickland discussed with Ms. Spalding was focused on the "stationary" side of the refrigerant business. Mr. Strickland would be responsible for driving demand for R-1234yf and "yf" blends, such as R-454B (as well as R-454A and R-454C).

**22.** Over the course of his career, Mr. Strickland had given a number of presentations to the refrigerant industry with representatives from the Environmental Protection Agency, and he was recognized for his regulatory knowledge. Mr. Strickland holds an

[1] R-454B is a refrigerant blend composed of 68.9% difluoromethane ("R-32") and 31.1% 2,3,3,3-tetrafluoropropene (R-1234yf) by weight.

EPA section 608 Technician Certification. Ms. Spalding expressed that she thought Mr. Strickland's regulatory expertise would be particularly useful to the Company.

**23.** Mr. Strickland met with a number of people at the Company, including Joe Martinko, the President of TSS (who is a member of Chemours's Corporate Executive Team, "CET"), and Shawn McCloskey, Americas Senior Business Director. Chemours hired Mr. Strickland for the position, and he began employment on August 28, 2023, reporting to Mr. McCloskey.

**24.** In his first few months on the job, Mr. Strickland performed his position well. In late January 2024, he received an "Orange Award" (an internal Company award) for his role in leading his team at the recent AHR Exposition, the major annual trade show for the Air Conditioning, Ventilation, Heating, and Refrigeration industries. Mr. Martinko circulated news of the announcement across TSS, and Mr. Strickland received numerous text messages from co-workers congratulating him for his work at the show.

**25.** Mr. Strickland also frequently received informal praise from Mr. McCloskey. In January 2024 alone, Mr. McCloskey said that he was a "big fan" of Mr. Strickland's work, and informed Mr. Strickland that he had raved to Mr. Martinko about the collaborative training Mr. Strickland was leading with the Americas Team and its American, Mexican, and Brazilian customers at the Company's Customer Discovery Hub. Mr. McCloskey was also impressed with the work that Mr. Strickland and his team did during their Execution Review, a significant strategic presentation early in the year, and in particular singled out the way Mr. Strickland had collaborated with his team. On February 7, 2024, McCloskey texted Mr. Strickland: "Thanks Nick! You did great as did your team. I really like the direction we are headed!"

**Mr. Strickland Learned Information that Indicated That R-1234yf was a Reproductive Toxin.**

**26.** During this same timeframe, Mr. Strickland began to learn disturbing things about R-1234yf, the core component of Opteon products.

**27.** During a conversation on January 27, 2024, Andrew Pansulla, a technical specialist with Chemours who worked closely with Honeywell on related joint products, alluded to how he thought R-1234yf "might be toxic." Additionally, on February 2, 2024, Mr. Strickland was on a call with representatives of a major pharmaceutical customer. (R-1234yf is used in sophisticated cooling systems used by pharmaceutical companies.) The representatives, who appeared agitated, pressed Mr. Strickland for information on the "breakdown products" (i.e., byproducts) of the Company's refrigerants, which in Mr. Strickland's experience was an unusual question for a customer to ask.

**28.** On February 7, 2024, Mr. Strickland attended a team dinner in Wilmington. He was seated next to Laura Bartholomew, a Product Stewardship Manager. He asked Ms. Bartholomew what she felt the biggest challenge facing the Company was. She said it was "the German government's intention to label trifluoroacetic acid as a reproductive toxin." Ms. Bartholomew explained that when exposed to air, R-1234yf breaks down (completely) into trifluoroacetic acid, which is commonly known as "TFA." Given that refrigerants can and do leak from both stationary conditioners (such as residential HVAC systems) and mobile air conditioners, this was a significant problem.[2] A reproductive toxin or "reprotoxin" is a substance that has negative effects on human reproduction and may lead to fertility problems, birth defects, and/or complications during pregnancy.

[2] Indeed, the labels on cans of Opteon R-1234yf tout that the product comes "WITH LEAK STOP," which "Seals Rubber Leaks."

**29.** Mr. Strickland expressed his surprise, and asked about the change in policy. Ms. Bartholomew informed Mr. Strickland that the German government had conducted studies on rabbits that concluded that TFA was a reproductive toxin. She said that the government would be conducting more studies that were scheduled to be published in the near future.

**30.** The shift in position by the German agency was significant for a few reasons. First, in 2009, the EPA itself had published a notice of proposed rulemaking approving the use of R-1234yf on only a restricted basis due, in part, to toxicity concerns. (The restrictions were ultimately dropped as a result of industry litigation in which Honeywell played a lead role.) Given this history, the EPA was likely to take note of the classification shift by an important regulatory peer.

**31.** Second, Germany is one of the world's leading chemical producers and exporters. It is also home to the headquarters of BASF, one of the world's largest chemical companies.

**32.** Mr. Strickland was disturbed by the information he received from Ms. Bartholomew. The next day, Thursday, February 8, 2024, Mr. Strickland was in meetings with other Company executives. During a break in one of the meetings, Mr. Strickland pulled aside Mike Rodgers, Head of Strategy for Chemours, and asked him if he knew about the German reproductive toxin study. Mr. Rodgers immediately became agitated and said, "Is that study out yet? Oh my God, this is a huge problem." He referred to TSS as "a one trick pony." At the time, the Company's sales of products containing R-1234yf were in excess of $800 million, and Chemours was heavily dependent on these sales for its business.

**33.** Later that same day, after meeting with Mr. Martinko, and upon information and belief, discussing the toxicity issue Mr. Strickland had raised, Mr. Rodgers was uncharacteristically critical of one of Mr. Strickland's ideas, saying that it would anger customers.

**34.** The next day, on Friday, February 9, 2024, Mr. Strickland was at a breakfast meeting with Ms. Spalding. Mr. Strickland asked if she had heard of the reproductive study and the German government's intention to classify TFA as a reproductive toxin. Ms. Spalding reflexively said, "I've never heard about a reproductive toxin." Then, without pausing, she said, "Do you think we [Chemours] knew?"

**35.** Mr. Strickland recalled something he had learned during his tenure, years earlier, with DuPont. In 2006, John McMenamin, the European Head of Sales for DuPont, had told Mr. Strickland that a refrigerant under development at DuPont, known as "DP-1," had failed toxicity tests in rabbits. (Laboratory rabbits are often used to test toxicity in chemicals.)

**36.** At the time, DuPont had been trying to develop DP-1 as a replacement for R-134a, a predecessor refrigerant that was found to have a high global warming potential and was in the process of being phased out by international environmental regulators. As a result of the failed test, Mr. Strickland had subsequently learned, DuPont approached Honeywell, who was attempting to develop its own low-global warming potential successor compound, known as "Fluid H." When representatives of the two companies met, they realized that DP-1 and Fluid H had the same primary component. They subsequently formed a joint venture to develop, produce, and manufacture R-1234yf.

**37.** At the time of his conversation with Ms. Spalding on February 9, 2024, Mr. Strickland had not known that R-1234yf was the primary component of DP-1, but he now realized that it likely was. And thus, he realized that DuPont had known about the toxicity of R-1234yf since 2006, even though neither it nor Honeywell had ever disclosed the failed toxicity tests to government regulators (such as the Environmental Protection Agencies or the Consumer Product Safety Commission), customers, or investors. Additionally, since Mr. McMenamin of DuPont had known of the failed toxicity test, it was certain that other senior DuPont executives who had subsequently become Chemours executives, including Mr. Martinko, the President of TSS within Chemours, and Diane Picho, who oversaw the DuPont Honeywell joint development agreement, had also known.[3]

**38.** Mr. Strickland disclosed the prior test to Ms. Spalding, and said that he believed the Company had known about the unfavorable toxicity results.

**39.** Mr. Strickland understood that under hazard communication standards promulgated by the Occupational Safety and Health Administration ("OSHA"), chemical manufacturers were required to evaluate the hazards of the chemicals they produced, and prepare labels and safety data sheets ("SDS") to convey the hazard information to their downstream customers and their employees. (OSHA's Hazard Communication Standard was revised in 2012, at which point SDS replaced the Material Data Safety Sheets, or "MSDS," that preceded them.) He was also aware that the SDS for Opteon products

[3] Additionally, Mr. Strickland would subsequently learn of a 2008 rabbit study on which DuPont was a co-development partner with Honeywell and co-supplied the tested material, that found fetal cardiac malformations attributable to R-1234yf.

containing R-1234yf, including the SDS for R-454B, did not contain any statements relating to health hazards, including as to reproductive toxicity.

**40.** Mr. Strickland told Ms. Spalding that if the Company had to label its refrigerants as a reproductive toxin on safety data sheets, it would be "impossible" to send the product "into consumer applications" (i.e., consumer products), which would essentially leave the business unit with "nothing to sell."

**41.** During the fall, Ms. Spalding had encountered difficulty finalizing a new agreement with HVAC manufacturer Carrier, Chemours' largest customer for R-454B, who had indicated that it wanted indemnification language relating to the use of R-454B. Ms. Spalding wondered aloud if that was why Carrier had recently been "pushing back" on the agreement.

**42.** After his separate conversations with Mr. Rodgers and Ms. Spalding, Mr. Strickland was extremely concerned about the health and safety impact of R-1234yf and yf-containing blends, including R-454B.

**43.** He investigated the National Fire Protection Association ("NFPA") rating for R-1234yf. The NFPA health rating system is used by first responders, such as law enforcement, firemen, and emergency medical service workers, so that they may quickly identify and assess risks associated with hazardous chemicals. One of the hazards that are rated by NFPA, the health hazard, appears on a diamond-shaped placard that, under NFPA standards, should appear on those locations of a building or facility where a first responder would be likely to encounter it. (The NFPA tests chemicals in collaboration with the manufacturing company.)

**44.** Mr. Strickland discovered that R-1234yf had a health rating of "Level 1: slight hazard." Since there were no health hazards listed on the SDS for R-1234yf, the health rating on the NFPA placard troubled him. Additionally, in his research, he observed that Level 1 was also the health hazard rating for R-1216, a precursor for almost every per- and polyfluoroalkyl substance ("PFAS")[4] (i.e., forever chemical). It was also a base material used to make R-1234yf.

**45.** On February 10, 2024, Mr. Strickland texted his direct supervisor, Mr. McCloskey, with images of the NFPA placard for both R-1216 and R-1234yf showing the same health hazard level. Mr. McCloskey confirmed that R-1216 was highly hazardous and was used to make Teflon plastic, one of the Company's most well-known brands. Mr. McCloskey said that operators at the Washington Works plant, the flagship manufacturing facility in West Virginia that manufactures Teflon, were required to wear positive pressure personal protection equipment when using the substance. (Mr. McCloskey knew this because he had worked at Washington Works for a number of years.) Mr. Strickland thus knew that Chemours was aware of the significant health hazards associated with R-1216 and actively managed these risks at Washington Works.

**46.** Mr. Strickland requested input from Amber Stephenson, Senior Director of Technology at Chemours, about R-1216. Ms. Stephenson confirmed that R-1216 was highly toxic, and included in her response the OSHA pictogram for a Reproductive Toxicity Health Hazard for R-1216. Her response amplified Mr. Strickland's concern

[4] PFAS, a large group of man-made synthetic chemicals used to make consumer and industrial products, resist heat, oil, stains, grease, and water. They are called "forever chemicals" because the strong bond between their carbon and fluorine atoms prevents them from breaking down easily in the environment or the human body. https://www.epa.gov/pfas/pfas-explained.

that the SDS required by OSHA for R-1234yf and yf blends containing it, including R-454B, was not accurate.

**47.** Only days later, on February 13, 2024, Chemours announced that it was postponing for two weeks the release of its financial results for the previous year and the related conference call, which had been scheduled for February 14 and 15, 2024, respectively. In a written statement, the Company blamed the delayed earnings release on "maintaining effective controls related to information and communications." It also wrote, "The Company's Audit Committee also needs additional time to complete a related internal review."

**48.** The next day, February 14, 2024, Mr. Strickland asked Mr. McCloskey if the delayed earnings announcement was related to the toxicity issues Mr. Strickland had been raising. Mr. McCloskey said that he had spoken with Mr. Martinko, who would not tell Mr. McCloskey "what was going on, but it [was] not related to the toxicity questions" Mr. Strickland had been asking. Mr. McCloskey thought it was "something to do with the financials."

**49.** Given his position as the Americas Marketing Manager, Stationary Refrigerants, it was part of Mr. Strickland's role, and a responsibility he took seriously, to communicate accurately the nature and risks of the product he had a role in marketing and selling. By this point, based on his knowledge of Company history, his research of the NFPA rating of R-1234yf, and his conversations with others in the Company, Mr. Strickland was very concerned about the health and safety impact of products containing R-1234yf, including R-454B. He held a growing concern that the Company had not and was not fully disclosing the health hazards associated with products containing R-1234yf

and that the Company was falsely representing and advertising them. There was nothing on any of the product labels for R-1234yf (or R-454B) that warned of possible reproductive or developmental toxicity.

**50.** Mr. Strickland requested a meeting with Heather Connors, the Marketing Communications Manager, to understand the reproductive toxicity report and the Company's official position on it. During a call on Wednesday, February 14, 2024, Ms. Connors confirmed that Chemours was aware of the German study. She pulled up the website for the European Chemical Agency ("ECHA"), an agency of the European Union that regulates the safe use of chemicals, which referred to the study, and then showed Mr. Strickland talking points the Company had developed in response to it. The document was stamped: "DO NOT DISTRIBUTE OUTSIDE OF CHEMOURS. FOR INTERNAL USE ONLY." The talking points were listed "For reactive use only," which Mr. Strickland understood meant that Chemours employees were not to bring up the issue unless asked, and that the Company was not planning on disclosing the study findings. Among other points, the talking points emphasized that TFA was naturally occurring, and that the Company did not manufacture or sell TFA – recall that when exposed to air, R-1234yf breaks down (completely) into trifluoroacetic acid, or "TFA", so the fact that the Company did not manufacture or sell TFA side-stepped the main issue: the Company manufactured and sold R-1234yf, which breaks down to TFA in the normal use case.

**51.** Mr. Strickland believed the Company's talking points greatly minimized the impact and scope of the potential issues. The notion that Chemours did not manufacture or sell TFA, in particular, seemed misleading, since people at the Company, including Ms. Bartholomew, were aware that R-1234yf breaks down completely into TFA. He was

concerned that the Company was either covering up the information or that senior management simply did not understand the impact of the German agency's decision.

**52.** On February 15, 2024, Mr. Strickland reached out to Mr. McCloskey to discuss the strategic importance of Germany's intention to label TFA as a reproductive toxin. Mr. Strickland reiterated that he had "been digging into" the issue. He said it was "above [his] pay grade" but he thought it was a "huge problem", and he thought that Mr. McCloskey should get the leadership team (including Mr. Strickland, Doug Westerhoff, Bridget Horn, and Mr. McCloskey) together to address the issue as soon as possible.

**53.** The following day, February 16, 2024, Mr. Strickland called Mr. McCloskey to share some good news: he had just secured a critical meeting with the CEO of Hussmann, a prospective large customer. Mr. Strickland could sense immediately that Mr. McCloskey was agitated. He could barely talk to Mr. Strickland, and abruptly ended the call.

**54.** Upon information and belief, at this point, Mr. McCloskey knew that the Company was going to terminate Mr. Strickland's employment.

**<u>Days After He Questioned the Reproductive Toxin Findings, Chemours Fired Mr. Strickland.</u>**

**55.** During a videoconference on February 21, 2024, Mr. McCloskey informed Mr. Strickland that Chemours had decided to terminate his employment. At times during the meeting, Mr. McCloskey claimed that he had made the decisions, but when he said that the reason for the termination was Mr. Strickland's failure "to collaborate with his peers," Mr. McCloskey said that he "didn't see it" – i.e., he did not agree that Mr. Strickland had failed to collaborate with peers. On the heels of that statement, and apparently realizing that he had just admitted that he did not make the decision to terminate Mr. Strickland, he

backpedaled and claimed that the decision "had nothing to do with upper management." (The rationale for termination that Mr. Strickland had failed to collaborate with peers was also severely undermined by the Orange Award he had received only weeks earlier for his role in leading his team at the AHR Exposition, which Mr. McCloskey had attributed to Mr. Strickland's successful collaboration with his peers.)

**56.** Shortly thereafter, Mr. McCloskey provided a separate termination letter, which claimed, "In the past few months, we have shared regular feedback to review your onboarding / 90 day plan and to address improvements we would like to see." Mr. McCloskey had not mentioned any such plan during the termination meeting, and Mr. Strickland had never been informed that he was subject to a "90-day plan," which would have expired in late November 2023 in any event.

**57.** Earlier that same day, February 21, 2024, Ms. Spalding told Mr. Strickland about an email she sent to Mr. McCloskey indicating that she thought she knew why Carrier was pushing back on its new deal, and that the reason was the reproductive toxin study Mr. Strickland had asked her about. Mr. McCloskey responded: "Interesting insight."

**58.** On February 29, 2024, Chemours suspended Mark Newman, its Chief Executive Officer, Jonathan Lock, its Chief Financial Officer, and Camela Wisel, its Controller. Mr. Newman resigned on March 22, 2024, and Mr. Lock resigned on April 23, 2024. Their resignations were widely reported to be the result of ethical violations (relating to financial and accounting manipulations) and issues with the "tone at the top" that the Company acknowledged after an internal review.

**59.** Mr. McCloskey left Chemours approximately a month after the Company fired Mr. Strickland.

**60.** On March 22, 2024, as a result of the change in leadership, the Company named Denise Dignam as its new President and Chief Executive Officer (as well as a member of the Company's Board of Directors).

**61.** On March 27, 2024, in its 10-K, Chemours disclosed for the first time that Germany had taken steps to reclassify TFA as a reproductive toxin. Chemours repeated this disclosure in a 10-Q filed on April 30, 2024.

**62.** Ms. Dignam was a long-time colleague and friend of Mr. Strickland, and only a few weeks prior to his termination, Ms. Dignam had expressed interest in naming Mr. Strickland as the Company's Head of Sales for Titanium Dioxide Products.

**63.** Following the change in leadership, Mr. Strickland reached out to Mr. McCloskey and expressed interest in rejoining the Company. But no one responded to his overture.

**64.** In addition to substantial economic and wage losses Mr. Strickland has suffered significant emotional distress as a result of the Company's retaliation against him, including physical symptoms that have required treatment at a hospital.

**COUNT I – RETALIATION IN VIOLATION OF THE CONSUMER PRODUCT SAFETY IMPROVEMENT ACT OF 2008 (15 U.S.C. § 2087)**

**65.** Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

**66.** Under the Consumer Product Safety Improvement Act of 2008 ("CPSIA"), 15 U.S.C. § 2087, it is unlawful for any manufacturer, private labeler, distributor, or retailer to discharge or otherwise discriminate against an employee because the employee provided to the employer (or was about to provide to the employer or cause to be provided to the employer) information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the Consumer

Product Safety Act or any other act enforced by the Consumer Product Safety Commission, or any order, rule, regulation, standard, or ban under any such acts.

**67.** Defendant Chemours is a "manufacturer" under the CPSIA because it manufactures a consumer product.

**68.** R-1234yf (marketed by Chemours as Opteon) is a "consumer product" under the CPSIA because it is an article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise.

**69.** R-454B (which is a blend containing R-1234yf and is marketed by Chemours as Opteon XL41) is a "consumer product" under the CPSIA because it is an article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise.

**70.** Plaintiff Strickland was an employee of Chemours, which was an employer under the CPSIA.

**71.** Plaintiff Strickland engaged in protected activity by investigating the reproductive toxicity of R-1234yf and the Company's knowledge of the reproductive toxicity of R-1234yf, and providing information to the Company that R-1234yf was a reproductive

toxin and that the Company had known it was a reproductive toxin for years but failed to disclose that fact while continuing to manufacture and sell R-1234yf.

**72.** Plaintiff Strickland reasonably believed that by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 *et seq.*, and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261 *et seq.*, and regulations promulgated thereunder, which prohibits the shipping or selling of misbranded hazardous substances in interstate commerce.

**73.** The FHSA is an act enforced by the Consumer Product Safety Commission.

**74.** Defendant Chemours, including Mr. McCloskey, Ms. Spalding, Mr. Rodgers, Mr. Martinko, and Ms. Connors, knew or were aware that Plaintiff Strickland engaged in protected activity under the CPSIA.

**75.** Defendant Chemours took adverse actions against Plaintiff Strickland, including by terminating his employment.

**76.** Defendant Chemours took these actions of retaliation and discrimination because Plaintiff Strickland engaged in protected activity, and the reasons Defendant Chemours asserted for these actions were, in fact, a pretext for such retaliation and discrimination.

**77.** As a direct and proximate result of Defendant's unlawful actions, Plaintiff Strickland has suffered economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial.

**78.** Additionally, as a direct and proximate result of Defendant's unlawful actions, Plaintiff Strickland has suffered emotional anguish and distress, as well as damage to his reputation, justifying an award of monetary damages to be proven at trial.

**79.** As authorized by 15 U.S.C. § 2087, Plaintiff Strickland seeks all relief necessary to make him whole, including reinstatement (or, in lieu of reinstatement, front pay); backpay; compensatory damages; special damages; reimbursement of attorneys 'fees, and costs associated with pursuing this matter; and all other relief that this court deems appropriate.

**COUNT II – REPRISAL IN VIOLATION OF THE DELAWARE WHISTLEBLOWERS ' PROTECTION ACT (Del. Code Ann. Tit. 19 § 1701 *et seq.*)**

**80.** Plaintiff restates and re-alleges the foregoing paragraphs as though fully set forth herein.

**81.** The Delaware Whistleblowers 'Protection Act ("DWPA") makes it unlawful for an employer to discharge or otherwise discriminate against an employee because the employee reported verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur.

**82.** For purposes of the DWPA, a "violation" includes an act or omission by an employer, or an agent thereof, that is "[m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation promulgated under the laws of this State, a political subdivision of this State, or the United States, to protect employees or other persons from health, safety, or environmental hazards while on the employer's premises or elsewhere." Del. Code Ann. Tit. 19 § 1702(6)(a).

**83.** For purposes of the DWPA, a "violation" also includes an act or omission by an employer, or an agent thereof, that is "[m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of this State, a political subdivision of this State, or the United States, to protect any person from fraud, deceit, or misappropriation of public or private funds or assets under the control of the employer." Del. Code Ann. Tit. 19 § 1702(6)(b).

**84.** Plaintiff Strickland was an "employee" because he was a person employed full or part-time by an employer.

**85.** Defendant Chemours was an "employer" because it was a corporation or other business entity that employed Plaintiff Strickland and other individuals to perform services for wages.

**86.** Mr. McCloskey was Mr. Strickland's supervisor because he was an individual to whom Defendant Chemours had given the authority to direct and control the work performance of Mr. Strickland and, alternatively, an individual who had the authority to take corrective action regarding the violation of a law, rule or regulation about which Mr. Strickland complained.

**87.** Mr. Rodgers was Mr. Strickland's "supervisor" for purposes of the statute because he was an individual who had the authority to take corrective action regarding the violation of a law, rule or regulation about which Mr. Strickland complained.

**88.** Ms. Spalding was Mr. Strickland's "supervisor" for purposes of the statute because she was an individual who had the authority to take corrective action regarding the violation of a law, rule or regulation about which Mr. Strickland complained.

**89.** Ms. Connors was Mr. Strickland's "supervisor" for purposes of the statute because she was an individual who had the authority to take corrective action regarding the violation of a law, rule or regulation about which Mr. Strickland complained.

**90.** Plaintiff Strickland engaged in protected activity by investigating the reproductive toxicity of R-1234yf and the Company's knowledge of the reproductive toxicity of R-1234yf, and providing information to the Company that R-1234yf was a reproductive toxin and that the Company had known it was a reproductive toxin for years but failed to disclose that fact while continuing to manufacture and sell R-1234yf.

**91.** Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 et seq., and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261 et seq., and regulations promulgated thereunder, which prohibits the shipping or selling of misbranded hazardous substances in interstate commerce.

**92.** Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq., and regulations promulgated thereunder, which require reporting, record-keeping, and testing relating to chemical substances and/or mixtures. Among other requirements, the TSCA requires a producer of a new chemical to include all test data known (or reasonably ascertainable) to the producer in its pre-manufacture notice, which is submitted to the

Environmental Protection Agency. 15 U.S.C. § 2604; 40 C.F.R. §§ 720.40-720.50. Such test data includes data on the effect of the chemical to human health and the environment. Id. Additionally, the TSCA requires that any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the EPA. 15 U.S.C. § 2607(e).

**93.** Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 seq., and regulations promulgated thereunder, which require the disclosure of safety information for hazardous chemicals. Among other requirements, to promote workplace safety, the OSHA standard pertaining to hazard communication requires that chemical manufacturers provide a safety data sheet ("SDS") providing certain safety information, including toxicological information, for hazardous chemicals. 29 CFR § 1910.1200(g).

**94.** Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Delaware Consumer Fraud Act ("DCFA"), Del. Code Ann. Tit. 6 § 2511 et seq., which prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such

concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise.

**95.** Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours violated the Delaware Deceptive Trade Practices Act ("DDTPA"), Del. Code Ann. Tit. 6 § 2531 et seq., which prohibits a person, in the course of business, from representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

**96.** Defendant's violations of the CPSA, the FHSA, the TSCA, the OSH Act, the DCFA, and the DDTPA, and rules and regulations under those statutes, were "violations" for purposes of the DWPA because they constituted acts or omissions by an employer that were "[m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation promulgated under the laws of" Delaware or the United States "to protect employees or other persons from health, safety, or environmental hazards while on the employer's premises or elsewhere." Del. Code Ann. Tit. 19 § 1702(6)(a).

**97.** Additionally, Plaintiff Strickland reasonably believed that, by failing to disclose that R-1234yf was a reproductive toxin, and by continuing to manufacture and sell R-1234yf without disclosing this fact (including on the labels of products containing R-1234yf), Chemours made materially false and misleading statements and omissions to

investors in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

98. Defendant's violations of these securities laws were "violations" for purposes of the DWPA because they constituted acts or omissions by an employer that were "[m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of" the United States "to protect any person from fraud, deceit, or misappropriation of public or private funds or assets under the control of the employer." Del. Code Ann. Tit. 19 § 1702(6)(b).

**99.** Defendant Chemours, including Mr. McCloskey, Ms. Spalding, Mr. Rodgers, Mr. Martinko, and Ms. Connors, knew or were aware that Plaintiff Strickland engaged in protected activity under the DWPA.

**100.** Defendant Chemours took adverse actions against Plaintiff Strickland, including by terminating his employment.

**101.** Defendant Chemours took these actions of retaliation and discrimination because Plaintiff Strickland engaged in protected activity, and the reasons Defendant Chemours asserted for these actions were, in fact, a pretext for such retaliation and discrimination.

**102.** As a direct and proximate result of Defendant's unlawful actions, Plaintiff Strickland has suffered economic and consequential losses, justifying an award of monetary damages in an amount to be proven at trial.

**103.** Additionally, as a direct and proximate result of Defendant's unlawful actions, Plaintiff Strickland has suffered emotional anguish and distress, as well as damage to his reputation, justifying an award of monetary damages to be proven at trial.

**104.** As authorized by the Del. Code Ann. Tit. 19 § 1704, Plaintiff Strickland seeks reinstatement (or, in lieu of reinstatement, front pay); backpay; full reinstatement of fringe benefits; compensatory damages; reimbursement of attorneys 'fees, and costs associated with pursuing this matter; and all other relief that this court deems appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE**, in consideration of the foregoing, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

a) Declare that Defendant's conduct violated the CPSIA and the DWPA;

b) Enter an order reinstating Mr. Strickland to his employment with Chemours (or, in lieu of such order, award him front pay in an amount to be proven at trial);

c) Award Mr. Strickland backpay in an amount to be proven at trial;

d) Award Mr. Strickland compensatory damages in an amount to be proven at trial;

e) Award pre-judgment interest and post-judgment interest at the applicable rates, court costs, and attorneys' fees; and

f) Award such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial on all of his claims triable by a jury.

[SIGNATURE ON FOLLOWING PAGE]

Dated: September 29, 2026

Respectfully submitted,

*Of Counsel:*
**ERIC SIEGEL LAW, PLLC**

Eric L. Siegel, Esq.
*(Pro hac vice motion forthcoming)*
888 17th Street, N.W.
Suite 1200
Washington, D.C. 20006
(t) (771) 220-6116
esiegel@ericsiegellaw.com

**JACOBS & CRUMPLAR, P.A.**

/s/ Patrick C. Gallagher
Patrick C. Gallagher, Esq. (DE 5170)
10 Corporate Circle, Suite 301
New Castle, DE 19720
(t) (302) 656-5445
pat@jcdelaw.com

*Counsel for Plaintiff*